Kate F. Thompson v. Commissioner.
Thompson v. Commissioner
Docket No. 21440.
United States Tax Court
1949 Tax Ct. Memo LEXIS 21; 8 T.C.M. (CCH) 1011; T.C.M. (RIA) 49271; November 30, 1949
*21 Leonard B. Levy, Esq., for the petitioner. John W. Alexander, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in income tax for the years 1941 and 1943 of $1,393.68 and $3,689.05, respectively. The year 1942 is in question by reason of the Current Tax Payment Act. The only issue is whether amounts received by petitioner as rents on real property and as beneficiary of a trust are community income taxable one-half to petitioner and one-half to her husband, as reported, or petitioner's separate income fully taxable to her, as determined by respondent. Findings of Fact Petitioner filed Federal income tax returns for the years in question with the collector of internal revenue for the New Orleans district of Louisiana. Petitioner and her husband were married in 1926 and in 1931 moved from Memphis, Tennessee, to New Orleans, Louisiana, where they have lived continuously since that time. During the taxable years petitioner owned the following undivided interests in four pieces of real property located in Memphis: Property
Interest
Acquired
59 South Main
1/3
1928
6 South Main
1/6
1935
77 South Main
1/12
1938
23 North Main
1/6
1938
*22 The properties were received as gifts from petitioner's parents and are owned by her, her son, and her brothers and sisters as tenants in common. During the taxable years, the properties were managed by an attorney named E. L. Williamson, who was employed by petitioner and the other owners at a salary of $300 per year. He collected rents, supervised repairs, and paid commissions to real estate agents for securing tenants. In connection with the collection of rents Williamson had an account in a Memphis bank under the name "Eighty Union," in which he deposited all rental receipts from the above properties as well as others in which petitioner owned no interest. He drew checks on the account payable to petitioner and the other owners each month for their proportionate share of the net income from the various properties. He prepared and filed Federal income tax returns for "Eighty Union" for the years in question on Form 1065, captioned - "PARTNERSHIP RETURN OF INCOME (To be Filed Also by Syndicates, Pools, Joint Ventures, Etc.)." "Eighty Union" is not a partnership, but merely a name used for convenience for the purpose of making tax returns, collecting and distributing rents, and *23 maintaining records. The property at 59 South Main had been leased to Peggie Hale, Inc., which vacated upon termination of the lease on September 30, 1940. The same property was leased to McLellan Stores Co. by an instrument dated September 1, 1939, for the period from October 1, 1940, to September 30, 1960. The second lease was amended to include additional space, by an instrument dated August 1, 1942. Petitioner's husband participated in discussions with the owners concerning the terms of the leases. A deed of trust covering this property was executed on May 15, 1939, securing a loan of $75,000. Annual payments of $3,000 were required by the deed, at 4 per cent interest. The deed of trust was refunded by a deed of trust on the same property, dated October 21, 1943, in which the interest rate was reduced and prepayment of principal allowed. Petitioner's husband discussed the deeds of trust with Mr. Smithwick (one of the other owners) and Williamson. The property at 6 South Main had been leased to Mulford Jewelry Co. in 1931, prior to petitioner's acquisition of her interest therein. The lease expired in 1941, and the property remained vacant until December 1942, when a fruit stand *24 proprietor was permitted under an oral contract to store his fruit in the building at night for $30 a week. Rents of $120 were received in 1942. The property is now leased for a long term to Walkover Shoe Co. The property at 77 South Main contains space for six stores carrying on retail businesses. The lease on one store was renewed on July 18, 1941, to Mangels of Tennessee, Inc., for a term beginning September 1, 1941, and ending August 31, 1947. The second store was leased on September 27, 1941, to Dr. Sydney Usdan, optometrist, for the period from November 1, 1941, to October 31, 1943. The third store was leased on January 12, 1939, for the period from March 1, 1939, to December 31, 1943. The fourth store was leased on September 26, 1940, to Slater Shoe Co. for the period from September 1, 1942, to December 31, 1943. The fifth store was leased on September 25, 1936, prior to petitioner's acquisition of her interest therein, to Florsheim Shoe Store Co. for a term of ten years. And the sixth store was leased in 1941 for a term of about six years. In connection with some of the leases on this property, petitioner's husband had discussions with Tom Farnsworth, one of the owners. *25 The property at 23 North Main had been leased in 1938, prior to petitioner's acquisition, to John Gerber Co. for a term of twenty years. A deed of trust was executed on March 28, 1939, to secure indebtedness of $50,000. It was refunded by a deed of trust on the same property executed October 21, 1943. Petitioner's husband discussed the terms with the owners. When petitioner's signature was required on documents relating to the rental properties, her husband would read the documents and advise her whether she should sign them. Petitioner has had no business training or experience. Her husband had extensive experience in the cotton business in Memphis prior to 1931, became vice-president of Canal Bank and Trust Company of New Orleans in 1931, and from 1933 to 1948 was special agent of the state bank commissioner in charge of liquidating that bank. Several times during each of the taxable years petitioner visited her son, brothers and sisters in Memphis. She discussed with them how the properties were renting, and their prospects for the future. Petitioner had a checking account in a Memphis bank, in which Williamson or her son would deposit the checks drawn by Williamson on *26 the account of "Eighty Union" representing petitioner's share of rental receipts. She kept her own check book, and on its stub entered deposits in accordance with information received from Williamson or her son that amounts had been deposited. She drew checks on the account to buy clothing for herself and to pay household expenses. Petitioner and her husband each filed separate returns for the years in question, in which they reported the following amounts as receipts from "Eighty Union": Year
Amount
1941
$6,265.33
1942
5,307.10
1943
7,525.87 They each reported one-half of the above amounts as taxable income. On December 31, 1934, petitioner's son created a trust in which petitioner was named sole beneficiary and her brother, S. W. Farnsworth, was named trustee. Williamson was substituted as trustee in May, 1943. The corpus of the trust originally consisted of second mortgage bonds of Mid-South Realty Co. in the amount of $50,000. Subsequently 88 shares of stock of the same corporation were substituted for the bonds. On December 24, 1938, the 88 shares were withdrawn and replaced by the settlor's non-negotiable note for $50,000. At that time the settlor agreed *27 to secure the note within 90 days by a deed of trust on real property. But on December 30, 1939, the settlor agreed to secure the note by pledging accrued rentals instead of by executing the deed of trust. In connection with each of the above modifications of the trust agreement, petitioner's husband participated in conferences and discussions and advised petitioner to consent. Petitioner did not participate in the conferences and discussions, but on his advice she consented to the changes. In their returns for the years in question petitioner and her husband reported the following amounts received from the trust: Year
Amount
1941
$2,211.89
1942
3,389.06
1943
4,130.23 They each reported one-half of the above amounts as taxable income. Petitioner and her husband owned a one third interest as tenants by the entirety in real property located at 163 South Main Street, Memphis. In the year 1943 the property was sold at a capital gain to the one-third interest of $1,548.18. In their returns for the year 1943 petitioner and her husband each reported one-half of the gain. In his notice of deficiency, respondent determined that the amounts received as rents from *28 "Eighty Union," and the amounts received from the trust were not community income but were taxable in full to petitioner. Respondent further "held that your distributive share of the net long-term capital gain * * * $1,545.18, is your separate income." The trust and the real properties in question were not administered by petitioner's husband or by him and petitioner indifferently during the taxable years. Opinion Respondent has conceded the issue with respect to gain from sale of the property at 163 South Main Street, Memphis. The two remaining questions depend for their answer upon whether petitioner's Louisiana residence entitled her to report as community income the rents from real property located in Tennessee and income from a trust of which petitioner was beneficiary. Both items arose from sources which were concededly petitioner's separate property, but which she insits were under the administration of her husband and hence, under Louisiana law, gave rise to community income. [1]
*29 It is in the highest degree improbable that on any state of facts the rents from Tennessee real estate could be community property under Louisiana law. Tennessee law would govern the ownership of real property and it does not recognize the marital community; unaccrued rent is considered a part of the realty, and Commissioner v. Skaggs [2] is authority for the proposition that "the law of another State [would not] be effective to change the ownership of the crop on its gathering or of the rent on its becoming due," citing Robinson's Succession, 23 La. Ann. 174. If the rents thus remained separate property after becoming due even under the law of Louisiana, no state of facts as to the husband's administration would suffice to make them community income. But in any event we are not convinced by the record that acts by the husband in connection with the property amounted to administration by him. Mere advice or even agency does not suffice but what is required is a type of dealing which simulates the relationship to that of ownership by the *30 husband. "What is meant by leaving the administration of the wife's property to the husband is the exercise of a voluntary election by which the wife abandons her own rights of authority and control and suffers the husband to manage not as her agent subject to her authority but as if the property were his own." Lazard v. Commissioner (C.C.A., 5th Cir.), 153 Fed. (2d) 348, 349. "We do not think that this is a case of separate property of the wife 'under the administration' of her husband. Such a case is presented only when the husband with the consent of the wife uses the separate estate of the wife for his own benefit or that of the community. It is not presented when the husband acts merely as the agent of his wife and for her benefit." Paul v. Arxbult, 164 La. 841, 114 So. 706. As to the husband's dealings with the real property, it is difficult to bring them within the concept so described. Actual administration of the properties appears to have been primarily in the hands of a Tennessee attorney named Williamson, who received compensation for acting as the agent for petitioner and other members of her family. See Lucas v. Commissioner (C.C.A., 5th Cir.), 134 Fed. (2d) 319. *31 Details of the leasing and mortgaging of the properties were apparently discussed informally among petitioner's husband, the members of her family, and Williamson. Some discussion was also participated in by petitioner to an extent which it is difficult to estimate from her testimony. The husband is not shown to have taken part in the actual execution of any of the leases. He "had entire confidence that Mrs. Thompson's interest was being taken care of." (Italics supplied.) The husband's participation thus resembles more that of an advisor and consultant whose examination of the leases and other documents was a preliminary to petitioner's signature. And the proceeds of the management were in each case delivered to petitioner and not to her husband; if they were used to any extent for community purposes, they were so used by her and not by him. We think the evidence totally inadequate to show that the administration of the real property was by the husband, and for his benefit or that of the community, within the principles previously stated. Mary Louise Guste, 8 T.C. 1261. Even less persuasive are the facts relating to the trust of which petitioner was the beneficiary. *32 Petitioner's son created the trust, naming her brother as the trustee. No actions whatever with respect to this trust are shown to have been undertaken by the husband in any of the tax years before us. The latest modification of the trust, concerning which petitioner's husband participated in discussions and gave petitioner advice, took place in 1939, two years prior to the earliest year now in controversy. Even if that could be said to have been an administration, a point which seems highly doubtful, [3] nothing of the kind appears during the period we are considering. The situation is more like that in Mary Louise Guste, supra, 1266, 1268, where we said: "* * * The evidence is clear that the complete operation of the restaurant is in the hands of petitioner's brother * * *. Here, obviously, the restaurant, the principal source of income, was not under the administration of the husband. * * *" That trusts are no exception to the rule requiring actual administration by the husband appears conclusively from Trorlicht v. Collector (La. Ct. of Appeal), 25 So. (2d) 547, as to which the following comment has been made: $"In the * * * [Trorlicht] case it is clear *33 that there was no administration of the trusts by the husband. They of necessity had to be administered by the trustee. [7 La. L. Rev. 588, 591.]" We conclude that as to receipts from both the rentals and the trust there was no such administration by the husband as to constitute them community income. Decision will be entered under Rule 50. Footnotes
1. "2383. DEFINITION. - All property, which is not declared to be brought in marriage by the wife, or to be given to her in consideration of the marriage or to belong to her at the time of the marriage, is paraphernal." * * *
"2386. When the paraphernal property is administered by the husband, or by him and the wife indifferently, the fruits of this property, whether natural, civil, or the result of labor, belong to the conjugal partnership, if there exist a community of gains. If there do not, each party enjoys, as he chooses, that which comes to his hand; but the fruits and revenues which are existing at the dissolution of the marriage, belong to the owner of the things which produced them."↩
2. Commissioner v. Skaggs (C.C.A., 5th Cir.), 122 Fed. (2d) 721, certiorari denied, 315 U.S. 811↩.
3. "* * * We say this because we think that the mere * * * giving of advice now and then, does not constitute such an administration by the husband as is contemplated by the Code. * * *" Trorlicht v. Collector (La. Ct. of Appeal), 25 So. (2d) 547, 551↩.